IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 15, 2020

## STATE OF TENNESSEE v. JEREMY WARD

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-492      Mark J. Fishburn, Judge**

_____

### No. M2019-00852-CCA-R3-CD

_____

A jury convicted the Defendant, Jeremy Ward, of aggravated robbery, aggravated burglary, employment of a firearm during the commission of or attempt to commit aggravated burglary, and being a felon in possession of a firearm. On appeal, the Defendant asserts that the evidence regarding identity was insufficient to support the conclusion that he was the culprit, that the trial court erred in denying his motion to suppress the victim's show-up identification, and that the trial court erred in denying relief when the State produced discovery mid-trial. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Jeremy Ward.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Lody Powers and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The victim, Ms. Nika Walter, was robbed in her home at gunpoint in the presence of her three small children by three masked men carrying guns, and she gave a physical

description of the offenders to law enforcement. The Defendant, whose appearance matched the description of one suspect, was apprehended nearby, and the victim identified the Defendant as one of the suspects in a "show-up" shortly after the crime. Although the Defendant was not carrying a gun, a gun was found in a trashcan located in the immediate area of his arrest. While in jail, the Defendant made several incriminating statements in recorded telephone calls with his wife. At trial, the Defendant challenged the evidence establishing his identity. The Defendant presented evidence that he had left his car after an argument with his wife and that he was mistaken for the robber while searching for an acquaintance.

## Motion to Suppress

Prior to trial, the Defendant moved to suppress the victim's show-up identification on the basis that the identification procedure was unnecessarily suggestive and not reliable. At the hearing, the State introduced a recording of the preliminary hearing, at which the victim testified that on November 28, 2016, she was at her home on Litton Avenue with her three children, who were ages five, three, and five months, when three men carrying guns forced their way into the apartment, all asking for cash and for the victim's boyfriend, Mr. Stacy Ray.[1] As pertinent to the suppression issue, two of the perpetrators were wearing black, and one was wearing all gray. One of the men in black kept near the victim, keeping his gun aimed at her the entire time. This man had tattoos on her neck and made her walk around the home for fifteen minutes as the perpetrators looked for items to steal. The other perpetrator in black was short, with hair that would have been an afro if it had been combed out. The perpetrator in gray was wearing a gray hoodie, gray jogging pants, and black Air Jordan shoes, and he was heavyset. The victim testified that all three men had guns. She stated at first she believed all the guns were black but later said that she only knew for certain that the gun of the man who stayed near her was black. All three men had their faces covered so that she could not see their noses or mouths. The men stayed approximately twenty minutes and took a backpack into which they placed her MacBook and a necklace. She stated that other than the man who held his gun on her, the men did not actually say anything to threaten her or her children. When the men left, she was able to use a tablet to call Mr. Ray, who alerted the police. An officer drove her to the driveway of a home next to some construction, which was within yards of the apartment complex, for a show-up identification. She identified the Defendant based on his size, hair, and clothing but not based on any other identifying characteristic.

---

[1] Mr. Ray also goes by Mr. Stacy Warfield.

The preliminary hearing also included the testimony of Detective Clinton Schroeder of the Metropolitan Nashville Police Department ("MNPD"), who was a patrol officer at the time. Law enforcement received a description of the offenders, one of whom was a black man who was tall, heavyset, and wearing gray. Detective Schroeder stated that a responding officer saw a man attempt to enter a nearby house and flee to a construction area upon seeing the marked vehicle. Law enforcement used a dog to track the suspect, who was wearing gray sweatpants and a gray zip-up hoodie, and the suspect was apprehended near a shed in the driveway of a home. Police found a handgun with a black grip and silver slide approximately eight feet away in a trash can.

Officer Charles Wakefield of the MNPD testified at the suppression hearing that he responded to the emergency call at Litton Avenue on November 28, 2016, and began to set up a perimeter to prevent the escape of the suspects. Officer Wakefield turned off his emergency equipment, drove past the apartment complex, and turned onto an adjacent street, Bronte Avenue, where he observed a man walking down the driveway of a residence toward the street. As Officer Wakefield approached, the man changed his course, walking back up the driveway to the porch. The man "acted like he was getting his keys out to open the front door of the house." Officer Wakefield continued down the street and then turned his car around, at which point the man "took off running." The location where Officer Wakefield spotted the man was approximately one hundred yards from the victim's residence, and the man matched the description of the suspect in gray. The man ran towards a church at the intersection of Bronte and Litton Avenue, and Officer Wakefield lost sight of him. A K-9 officer was called to the church to start tracking the suspect, and the Defendant was apprehended approximately fifteen minutes later on Litton Avenue.

Detective Rachael Sacco of the MNPD testified at the suppression hearing that she responded to an emergency call regarding the robbery. She transported the victim for the show-up when a suspect was apprehended. Detective Sacco testified that the Defendant was detained minutes after Detective Sacco responded to the scene and that the victim's identification took place less than forty minutes after the emergency call was received. Detective Sacco elaborated that the dispatch came in shortly after 8:00 p.m., that she arrived on the scene at 8:15 p.m., and that the victim's identification took place approximately at 8:41 p.m.

Detective Sacco testified that the Defendant was detained less than a mile from the scene of the crime. The victim was informed that police wanted her to determine "if the person that was detained was the suspect that was inside her home," and she was transported in the back of a police vehicle, with the "cage … opened," to the scene of the arrest. The scene was illuminated by streetlights, the patrol car's headlights, and the patrol car's spotlight, and the victim identified the Defendant "pretty quickly" at a

distance of approximately fifteen yards. Detective Sacco did not recall if the victim could see tattoos on the Defendant's neck from that distance or if the Defendant was handcuffed. The victim viewed the Defendant standing outside next to an officer and near a patrol car which contained the dog used by law enforcement.

Officer Randy Hines of the MNPD assisted in setting up a perimeter to prevent the escape of suspects after the crime. He recalled that a description of the suspects was released almost immediately after his arrival and that K-9 officers responded in approximately ten minutes. The offenders were described as three black men, two wearing black and one wearing a gray sweatshirt. The man in gray was described as being around six feet, one inch tall and weighing around two hundred and sixty pounds. A suspect was detained approximately thirty minutes after Officer Hines arrived.

The trial court found that law enforcement responded within minutes of the crime, that the Defendant was apprehended within a few blocks of the offense a few minutes after the arrival of law enforcement, and that the victim was able to identify the Defendant through his clothing, build, and hair approximately forty minutes after the emergency call. The trial court denied the motion to suppress, concluding that the show-up was an on-the-scene investigatory procedure conducted shortly after the commission of the crime and that it was not unnecessarily suggestive.

**Trial**

At trial the victim testified that as she was feeding her children dinner, someone knocked on the door. She could not determine who was at the door above the noise of her children and small dog, so she cracked the door and was pushed back into the apartment as three masked black men with guns entered, demanding cash and asking for Mr. Ray. The victim did not know who the men were.

The victim described one man as having a dark complexion and a tattoo on his neck and wearing all black; this man kept a black gun pointed at her the entire time. There was also a shorter man wearing dark clothing. The third man was "bigger," had a "low cut," and was wearing a gray hoodie, gray pants, and black Air Jordan shoes. All three had guns, and she described the guns as automatic. Because of their masks, she could only see their eyes and the upper part of their faces, including parts of their hairstyles. The man in gray pointed a gun at her five-year-old, who was crying and screaming, and told the child to be quiet. The men eventually put her laptop into one of her children's old backpacks, took her necklace, and left. She described summoning help through Mr. Ray and through her brother because she could not locate her telephone.

- 4 -

She testified that after she gave a description to police, they took her to identify a potential suspect. The police shined a light on him, and she knew from "how big he was and his weight," from "the shape of his body, … and what he was wearing," and from his hairstyle that it was the man in gray who had entered her home. The victim identified the Defendant at trial as the man in gray.

The victim testified on cross-examination that the handguns that she could see were black. She denied having told police that the Defendant had a tattoo. She acknowledged she had told the defense investigator who came to her home that she knew the Defendant, but she testified that what she meant was that Mr. Ray was acquainted with him and that she knew of the Defendant through Mr. Ray. She elaborated that Mr. Ray did not realize the Defendant was his acquaintance because Mr. Ray knew the Defendant as "J. Main" or "J. Man" and did not know the Defendant's legal name. When Mr. Ray saw the Defendant appear at the preliminary hearing, Mr. Ray recognized the Defendant as his acquaintance "J. Main." The victim reiterated that she did not remember ever seeing the Defendant prior to the crime, and she said, "I didn't really – no, I mean, I didn't know him. I've never had a conversation with him. I never remember seeing him. If I was to see him out on the street today, I wouldn't even know who he was."

The victim was not aware whether Mr. Ray owed anyone money. She agreed that the police had fingerprinted her home. She testified that during the show-up, she understood that she was being taken to see a suspect in the robbery. She described looking at the Defendant from the back of a police vehicle through the front window. The Defendant was illuminated by a light. There were no other civilians present at the show-up. The victim recalled that there were surveillance cameras at the apartment complex, but she did not ever review any recordings from them. She testified that she was never asked to see "photo line-ups or anything of that nature" at a later date.

The victim acknowledged that she at first told police she thought the offenders had taken a shoebox, but she testified that she later realized it was the box in which she kept her laptop. The victim acknowledged a drug conviction for possession of cocaine with intent to sell in 2009. She testified that the suspects did not ask for drugs and that Mr. Ray did not sell drugs.

Asked about later contact with investigators regarding the case, the victim stated that she at one time experienced a panic attack when she saw a group of teenagers at the apartment. Mr. Ray contacted the apartment manager, Ms. Ollie London, who realized that one of the teenagers had been banned from the apartment. The victim stated that if a responding police officer stated that the victim had called the police to say she saw one of the suspects, that would be inaccurate because she did not recall calling the police,

although Ms. London might have. She denied having told Ms. London that she recognized one of the suspects at the complex by his eyes and denied that she was afraid to discuss a different suspect because he lived at the apartment complex.

Detective Whitney Heinze was a patrol officer at the time and responded to the emergency call. She spoke to the victim, who was visibly upset and crying. The victim showed her several items that had been touched by the offenders, and the victim described the offenders. One of the offenders was a black man who was wearing all gray, over six feet tall, and heavyset, weighing approximately two hundred and sixty pounds.

Officer Wakefield testified consistently with his testimony at the suppression hearing that he turned right from Litton Avenue onto Bronte Avenue and saw a large-framed man in gray walk down the driveway of the second or third house, turn and walk back up the driveway, go up to the front door, and then flee when Officer Wakefield turned his vehicle around. Officer Wakefield was dispatched at 8:03 p.m. and saw the man approximately five minutes later. The man ran through the parking lot of the church on the corner and back onto Litton Avenue toward the apartment complex, where there was construction, and Officer Wakefield lost sight of him. Officer Wakefield stated that he chose to drive down Bronte Avenue because the back yards of the houses on that street abutted the apartment complex. While there was a six- to eight-foot tall metal fence enclosing the apartments, Officer Wakefield testified that when there were "issues in that area, people will jump the fence and run over that direction towards the railroad tracks." A K-9 officer tracked an individual beginning at the church where Officer Wakefield had lost sight of the man in gray. The Defendant was taken into custody near a detached garage approximately twenty to thirty minutes after Officer Wakefield first saw him. Officer Wakefield testified that the Defendant had the same clothing and body type as the individual he had first seen on the driveway. Officer Wakefield left the scene at 9:36 p.m. Officer Wakefield acknowledged it would be difficult for someone weighing two hundred and sixty pounds to climb over the fence, but he stated juveniles frequently leapt the fence.

K-9 Officer Terry Burnette's dog, Spike, started to track a suspect on Bronte Avenue, next to the church. The dog turned onto Litton Avenue and went a few steps past the driveway of the home neighboring the church. At that point, the dog circled back and lifted his head. Officer Burnette stated that the dog would keep his nose to the ground when tracking but would lift his head when he was close enough to the source of the scent that he could locate the suspect's odor on the air. As the dog began to walk up the driveway, the Defendant walked out from behind the house, saying, "I give up." Officer Burnette stated that his habit was to put the time he arrived on the scene in his report and that he had put 9:15 p.m. He stated it was possible he was mistaken about the

time.  He acknowledged it was damp and had been raining but stated that the weather had not affected Spike, who had performed particularly well that night.

Detective Rachael Sacco testified generally consistently with her testimony at the suppression hearing regarding the show-up.  She stated she told the victim, "we have someone in custody that could match the description and she could positively or negatively identify him."  She stated at trial that the victim identified the Defendant "[a]lmost immediately."  She did not recall any information regarding the suspects pointing guns at the children, and she recalled that the suspects were carrying black handguns.

Detective Clinton Shroeder testified consistently with his preliminary hearing testimony that he had helped take the Defendant into custody and that a silver and black handgun was found inside a trashcan about eight feet from where the Defendant was apprehended.  The Defendant was wearing all gray, including a gray hooded sweatshirt, and his front side was wet.  The Defendant volunteered that he had been arguing with his girlfriend.  Detective Shroeder agreed that the Defendant was compliant, that no stolen property was recovered, and that the Defendant probably expressed confusion regarding the arrest.  The Defendant gave his residence as an address on Porter Road located approximately one mile from the robbery.

Crime scene photographs taken by Officer Douglas Belcher show that the weapon was a semi-automatic handgun which had a silver slide but was black on the lower half of the barrel and the grip.  The trash can contained a black plastic trash bag, an aluminum can, and the gun.  Officer Belcher testified that the gun was fully loaded with fourteen bullets in the magazine and none in the chamber.  Officer Belcher agreed that there was some dirt and organic material in the grooves of the gun and that the gun and trash appeared dry, although it had been raining earlier.

The parties stipulated that a fingerprint from the magazine of the weapon excluded the Defendant.  The weapon was also submitted for DNA analysis, which was performed by Ms. Julie Ellis, a forensic scientist at the MNPD crime laboratory.  DNA recovered from the grip and from the trigger had at least two contributors, but no comparisons were performed due to the complexity and scarcity of the recovered DNA.

Officer Ryan Matson attempted to obtain fingerprints from the victim's home.  He was able to lift approximately five fingerprints from the scene.  The parties stipulated that some of the prints were of no value.  Fingerprints from a shoebox lid and the corner of an end table excluded the Defendant.

The State also introduced into evidence numerous telephone calls made by the Defendant to the telephone number of his wife, Ms. Amber Ward. Several of the calls contained statements from which it could be inferred that the Defendant was speaking about the weapon the police had confiscated or the circumstances of his fleeing the crime.

Mr. Terry Faimon, the director of communication research and court liaison for the district attorney's office, monitored several telephone calls made by the Defendant while he was in custody. Mr. Faimon testified that calls made from prison were made using an individual PIN number assigned to the inmate. He had encountered inmates using one another's PIN numbers "hundreds" of times, and while monitoring the Defendant's calls, he heard the Defendant state he was using another inmate's number. Through listening to hours of telephone calls, he became familiar with the Defendant's voice. Mr. Faimon stated that calls from "booking" made near the arrest date would not be associated with a particular PIN but that he was able to search these calls by looking for calls made to the Defendant's wife's telephone number. The State introduced three calls the Defendant made from booking, three he made with his own PIN, and three using another inmate's PIN.

The prosecutor introduced a disk containing the calls into evidence, but with the court's permission and without objection, the recordings played at trial were copies of the calls which had been downloaded to the prosecutor's computer. The prosecutor later sought to impeach a witness, the Defendant's wife, with the recordings entered as exhibits but was unable to play the first two calls. Defense counsel explained his understanding that the jail's system required a special software. The parties agreed that the prosecutor would begin cross-examination without playing the recordings and that the issue of the recordings would be revisited, but it was not. Because no substitution was ever made for this exhibit, we were unable to review the first two calls.

In a call made on November 29, 2016, the Defendant asked his wife what happened and described being arrested on "bogus charges." He recounted how he had told police that he and his wife were arguing and that he got out of the car to stop the argument from going further. He told his wife he did not know the reason for his arrest. His wife gave him the name of a man who had called, and he appeared confused, asking if she was referring to his brother. His wife told him she was referring to his cousin and that she had asked the man to call someone else, and the Defendant repeated numerous times that that had been "stupid," because "cuz will be like, 'cuz had my…'" and he concluded, "and they got that one."

On the same day, the Defendant called his wife, identifying himself through the automated system as "Main." The Defendant's wife told him that someone had called, and the Defendant asked her if she had "his" or "the other one." Ms. Ward said she did

not, and he asked her who did and told her to call "Six O." He then referred to the "other phone." Ms. Ward informed him that a man kept saying he needed "the other one," and asking where the "other thing" was. The Defendant interrupted her as she was speaking and cut her off.

On the same day, the Defendant spoke to a man, telling him, "I got another one for you, though." When the man asked about the "other one," the Defendant told him it was "put up." During a later call, the Defendant told the same man, "They got everything." The man asked the Defendant if they were "cool."

The Defendant again talked to his wife, observing that "they" should have waited. He said, "I seen where y'all came there down the street, though." He told his wife, "By the time I came across the fence, y'all was already gone all the way up the street already." He told her the arrest was ten to fifteen minutes "after cuz car went up the street."

On the day of the preliminary hearing, December 7, 2016, the Defendant discussed the preliminary hearing testimony with his wife. He laughed at the victim's explanation of the fact that she thought the robbers left with a shoebox, observing that only drug dealers keep money in shoeboxes. He told his wife that the victim had testified that his gun was all black and pointed out that the recovered gun was black and gray. The Defendant said, "It was so crazy, our guns wasn't even all black." He elaborated, "One of my guns is black."

Mr. Faimon acknowledged that out of over 164 calls, he only found a few that he played to the jury. He also acknowledged that in several calls, both the Defendant and his wife expressed surprise and confusion that he was arrested.

The parties stipulated that the Defendant had a prior drug-related felony, and the State finished presenting evidence on the second day of trial. The following morning, the Defendant filed a motion to continue based on a late disclosure of evidence from the prosecution. The parties informed the court that on the previous day, Detective James Rummage, who had not testified but was present in court, gave the prosecutor a folder which contained a photographic line-up relevant to the case. The line-up had been presented to the victim to see if she could identify a juvenile suspect. This was the same juvenile suspect whom the victim had discussed with the apartment manager, Ms. London. The defense noted that Ms. London was expected to testify that the juvenile had two known acquaintances who matched the description of the robbery suspects. The defense further noted that the victim did not identify the juvenile from the line-up and that she had denied in her testimony ever being shown a line-up. The Defendant requested either a mistrial or a continuance. The trial court ruled that the Defendant

could recall any of the State's witnesses, including the victim, to cross-examine them about the line-up, but it denied a further continuance or mistrial.

The Defendant gave testimony suggesting that this was a case of mistaken identity. According to the Defendant, on November 28, 2016, he resided at his aunt's house with his wife, and he asked his wife to take him from his aunt's house to see his children at their mother's home on Porter Road. The Defendant's relationship with the children's mother was a point of contention, and he and his wife argued in the car. When they got to Porter Road around 8:00 p.m., he told his wife to wait in the car, but she left. He testified that his conversations in the jail calls referred to her leaving the Porter Road address and not waiting for him. He discovered his children and their mother were not home, and he had no telephone to contact his wife. He decided to walk to his cousin's house on Litton Avenue because it was closer than his aunt's home. His cousin was not home, so he decided to go to the home of a friend of his hairstylist, Ms. Valerie "Meme" Dansby, on Litton Avenue. The porch light was on, so he kept knocking on the door. No one answered, and he began to leave, but he turned around to knock again. When he came off the porch and started down the driveway, he saw the police dog and was ordered on the ground. He testified he never touched the trash can. The Defendant asserted that during the show-up, the police only turned him to face the victim for a short period of time. His clothing was wet on the front because he was made to lie on the ground during the arrest. He denied going by the nickname "J. Main" or being acquainted with Mr. Ray. He stated he used the PIN of other inmates because his PIN was malfunctioning. He denied that the gun from the trash can was his and implied that the police planted it in the trashcan during a brief window where they turned off the lights illuminating the area.

The Defendant denied telling Detective Rummage he lived on Porter Road. He acknowledged having told the detective that he got out of the car because he did not want the argument with his wife to go "further." He acknowledged saying that he and his wife were arguing, that he got out of the car, that she pulled away, and that he then went to find a telephone. He agreed he did not mention visiting his children in his prior statement but stated it was because Detective Rummage did not ask.

The Defendant denied ever having been on Bronte Avenue, asserting that Detective Wakefield may have seen one of the actual perpetrators on Bronte Avenue. He stated that the yellow house on Litton Avenue where he was apprehended was the house of Ms. Dansby's friend, but he denied ever going toward the back of the house where the shed was. He asserted the K-9 officer was lying when he said the Defendant surrendered by saying, "I give up."

- 10 -

The Defendant acknowledged it was his voice on the telephone calls. Asked what his wife meant when she said in one of the calls that she "got Elijah and everything. I got both of them," he said she might have been talking about a different day.[2] Asked about a call where he told her that if she had just done what he had said, he could have just jumped back in, he explained he was talking about her leaving him at his children's mother's house on Porter. He did not recall saying the guns were not all black. He did not recall saying that by the time he got over the fence, "you all was already gone all the way up the street already." He recalled saying he was arrested ten or fifteen minutes after "you all left, after Cuz car went up the street" but stated he did not "understand the conversation right there." He asserted that no one else was with him and his wife that night.

Ms. Valerie "Meme" Dansby testified that she is a cosmetologist and that the Defendant was her client from 2014 until the early part of 2016. Ms. Dansby's ex-boyfriend lived in a yellow house on Litton Avenue next to the apartments where the robbery took place, and she sometimes would meet clients there. The Defendant was acquainted with her ex-boyfriend, and she still saw the Defendant occasionally after the last time she fixed his hair.

The Defendant's wife, Ms. Amber Ward, testified that on November 28, 2016, she and the Defendant lived with the Defendant's aunt on South 8th Street. The mother of the Defendant's three children lived on Porter Road, about one mile from the robbery, and the Defendant asked Ms. Ward to take him there that evening. She dropped him off at Porter Road around 8:20 or 8:30 p.m. Ms. Ward recalled that they were arguing, and she decided she would not wait for him at his children's mother's home as he had wanted but would leave to return to his aunt's house. The Defendant did not have a telephone with him, but she expected him to use the telephone of his children's mother to call her when the visit concluded. He contacted her from custody and was confused regarding his arrest. She stated she picked up his clothing as part of his personal belongings. His clothes were predominantly gray, but the jacket had a polo horse on it and the pants had three thick stripes.

On cross examination, Ms. Ward acknowledged that the location where the Defendant was arrested was not on the route from Porter Road to the Defendant's aunt's home. She acknowledged that, a few months before the arrest, she had signed a document under oath that the Defendant resided on Porter Road. She explained he used that address but lived with her at his aunt's home. Ms. Ward stated the Defendant did not

---

[2] We infer that this line of questioning relates to the two telephone calls which were not submitted in a readable format.

- 11 -

have guns but acknowledged that a prior document, signed under oath, showed that she had stated the Defendant had or had access to guns.

She did not recall the Defendant's asking her during a recorded telephone call why she did not come back or her responding that she was right there and got "both of them." She agreed that the Defendant told her in one of the telephone calls that if she had waited as she was supposed to do, he would have just jumped back in, but she stated that he was referring to picking him up from his children's mother's house. She did not recall the telephone call in which the Defendant told her that by the time he came across the fence "you all" had gone up the street. She agreed that her testimony was that she was alone that night. She also did not recall him saying he was taken into custody ten to fifteen minutes after "you all" left.

The Defendant cross-examined the victim further in light of the late-produced line-up. The victim testified that she thought she recalled discussing the robbery with Ms. London but did not recall saying she recognized the offenders by their eyes. She also recalled the day she panicked because she saw the juvenile who she thought might be one of the robbers. She did not recall talking with an officer about it or going to the police precinct. After hearing an audio recording of the line-up involving the juvenile, she recalled the conversation and agreed it was probably at the precinct. She recalled the detective placing pictures on the table. She clarified that the line-up was intended to see if she could identify one of the two offenders who had escaped and not intended to correct a misidentification of the Defendant. She stated she did not choose anyone from the line-up because she was not one hundred percent sure she could identify anyone and denied that she failed to make an identification because she was afraid to identify a culprit who lived in the same apartment complex as she did.

Ms. Ollie London testified that she asked the victim if she could recognize the culprits on the day after the crime, and the victim told her, "all I could see was the eyes." She recalled a confrontation on the day after the robbery between Mr. Ray and the juvenile suspect, who lived on the property with his grandmother and who had a gun during the confrontation. She testified that in 2016, the fence around the complex was old and some bars had been pulled approximately eighteen inches apart. The juvenile was five feet, six or seven inches tall, and was skinny. Ms. London spoke to the police approximately a week after the robbery regarding the juvenile and regarding the juvenile's associate, "Big Homie." She described "Big Homie" as five feet, nine inches tall, with dreads in his hair that were "dipped" to be a reddish-blonde. She had never previously seen the Defendant. Ms. London testified that the surveillance cameras were not operational at the time of the crime because they had been disconnected due to the construction.

Detective Rummage testified that he was the lead detective on the case and that he interviewed the Defendant after the Defendant's arrest. The Defendant did not have a telephone at the time he was arrested. The Defendant told Detective Rummage that he lived on Porter Road with his wife. He said that he and his wife argued in the car and that he got out of the car in the area in which he was apprehended, but he did not say precisely where he got out. The Defendant told Detective Rummage that he was trying to go to the home of a friend of his hairdresser, but he did not know the friend's name. He stated that he was knocking on the door of the house on Bronte Avenue because his hairdresser's friend lived there. He never said he was attempting to visit his children or children's mother or that he was planning to go home to his aunt's house.

Detective Rummage acknowledged he did not interview Mr. Ray, that the Defendant's clothing was not kept as evidence, that he did not speak to Ms. London, that he never went to the apartment complex, that he did not investigate the Defendant's alibi, that despite having an apartment number for "Big Homie," he never attempted to find him at the apartment or confirm who the occupants were through utility bills. Detective Rummage stated that he could not remember the victim identifying the Defendant by a neck tattoo but that he may have seen the Defendant's neck tattoo during the interview and may have told the Defendant that the victim could identify it as an interview technique. The Defendant's booking photograph showed a faint tattoo on his neck. Detective Rummage acknowledged that another police officer continued to try to question the Defendant after the Defendant asked for an attorney because the other officer did not hear the Defendant's request.

Detective Rummage contacted the victim to present her with a photographic line-up which he created on December 15, 2016. The victim saw the line-up in the first week of January and did not make an identification, and he did not have her sign the photographic line-up. According to Detective Rummage, the juvenile in the line-up was approximately five feet, six or seven inches tall and weighed one hundred and forty-five pounds. The line-up was an attempt to identify an additional suspect rather than correct a misidentification of the Defendant.

The Defendant presented the testimony of Mr. Buddy Mitchell, a former police officer who worked as a private investigator. Mr. Mitchell interviewed the victim briefly, and she told him, "[W]ell, I know Jeremy Ward and he stuck a pistol in my kid's – to his head, and I know him, and he's going to jail and that's it." Mr. Mitchell also spoke to Ms. London and discovered an additional suspect through her, but he was unable to find a police report supplement showing further investigation. The Defendant's clothing had not been taken into evidence. After Ms. London gave him the nicknames of the additional suspect's associates, he was able to discover their real names. Mr. Mitchell submitted photographs of the area around the apartment complex. He identified an area

near the third house down from the church where there was a significant drop and brick wall after the apartment fence.

Detective Kimberly Brown, who was a patrol officer at the time, was dispatched to the apartment complex at some point after the crime because the victim had stated that she saw two men, one of whom had a neck tattoo and resembled one of the men who robbed her. Detective Brown spoke to Ms. London because the victim believed Ms. London would know the identity of the men whom the victim had seen. Detective Brown obtained the names of the individuals, but she did not interview them at the time. She acknowledged she had not put the date on her supplemental report. On cross-examination, Detective Brown clarified that the victim did not believe she had misidentified anyone but believed she had seen another one of the three men involved. The juvenile whom the victim had seen had a neck tattoo and was at the apartment complex with a man known as "Big Homie." Ms. London gave a description of "Big Homie" and the apartment numbers where the juvenile could be found and where "Big Homie" could be found.

The Defendant presented the testimony of Mr. Ray, who testified that he was taking a dog to the vet at the time the victim called him from her tablet to report the robbery. He called 911. Mr. Ray testified that he did not keep large amounts of cash but acknowledged that he had prior convictions for possession of cocaine and sale of cocaine. He recalled the victim saying that one man had a tattoo on his neck and was heavyset. The others were smaller and also had tattoos. Mr. Ray testified that he recognized the Defendant at the preliminary hearing as his acquaintance "J. Main." He had not previously known the Defendant's actual name and did not realize he was acquainted with the person who had been apprehended in relation to the crime. Mr. Ray knew the Defendant through one of Mr. Ray's neighbors. The neighbor was frequently at Mr. Ray's home, and Mr. Ray stated the Defendant may have been in his home once.

The jury convicted the Defendant of aggravated robbery, aggravated burglary, employment of a firearm during the commission of or attempt to commit aggravated burglary, and being a felon in possession of a firearm. The trial court sentenced the Defendant to serve twelve years for aggravated robbery, ten years for aggravated burglary, ten years for employment of a firearm, and four years for being a felon in possession of a weapon. The charge for employment of a firearm was ordered to be served consecutively to the underlying offense of aggravated burglary under statute, and the remaining convictions were ordered to be served concurrently for an effective twenty-year sentence.

At the motion for a new trial, the Defendant raised several issues, including a challenge to the admission of the show-up identification, the failure to grant a

continuance based on the untimely disclosure of the photographic line-up of the juvenile, and the sufficiency of the evidence related to identity. The trial court denied the motion for a new trial, and the Defendant appeals.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the trial court erred in denying his motion for judgment of acquittal because the evidence did not establish his identity as the perpetrator of the offenses. We conclude that although the evidence establishing the Defendant's identity is certainly not overwhelming, it is legally sufficient to uphold the verdict.

If the evidence at trial is insufficient to sustain a conviction, a trial court may enter a judgment of acquittal. Tenn. R. Crim. P. 29(b). This judgment may be rendered at the close of the State's proof or at the close of evidence, and it may be rendered before or after the jury's verdict. *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). In deciding a motion for judgment of acquittal, the trial court must determine the legal sufficiency of the evidence. *State v. Collier*, 411 S.W.3d 886, 892 (Tenn. 2013). "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction." *Little*, 402 S.W.3d at 211. Accordingly, the trial court must take the strongest legitimate view of the State's proof and draw all reasonable and legitimate inferences in favor of the prosecution. *Collier*, 411 S.W.3d at 893. If any rational trier of fact could have found the essential elements of the offense, then the motion for judgment of acquittal should be denied. *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007). A distinction arises between a challenge to the sufficiency of the convicting evidence and a challenge to the trial court's denial of a motion to acquit only when the defendant introduces proof after the State rests its case. *See id.* at 316. When the defendant does not stand on a motion for judgment of acquittal made at the close of the State's proof, the appellate court may then consider evidence introduced after the close of the State's case-in-chief in assessing the sufficiency of the evidence. *See id.* at 314, 316-17. Accordingly, while the Defendant frames the issue as a challenge to the denial of a motion for judgment of acquittal, we evaluate the Defendant's challenge to the identity evidence as a challenge to the sufficiency of the proof that he was the perpetrator, considering all the proof that was introduced at trial.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we grant the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The Defendant was convicted of aggravated robbery, which is the intentional or knowing theft of property from the person of the victim by violence or putting the victim in fear, accomplished with a deadly weapon or by the display of any article used or fashioned to lead the victim to reasonably believe the article to be a deadly weapon. T.C.A. §§ 39-13-401(a), -402(a)(1). Theft is knowingly obtaining or exercising control over property without the owner's effective consent and with intent to deprive the owner of property. T.C.A. § 39-14-103(a). As charged here, aggravated burglary is committed by entering a habitation without the effective consent of the property owner and committing or attempting to commit a theft. T.C.A. §§ 39-14-402(a)(3), -403(a). As charged, employment of a weapon during a dangerous felony required the State to show that the Defendant employed a firearm during the commission of or attempt to commit a dangerous felony and that the Defendant had a prior felony conviction. T.C.A. § 39-17-1324(b), (h)(2), (i)(1)(H). To show that the Defendant was a felon in possession of a weapon, the State had to show that the Defendant unlawfully possessed a firearm after having been convicted of a felony drug offense. T.C.A. § 39-17-1307(b)(1)(B).

While the Defendant does not contend that the evidence failed to establish that the victim was subjected to an aggravated robbery and burglary committed with a firearm, he asserts that the evidence was insufficient to show that he was the perpetrator of the crimes. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of

evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Pope*, 427 S.W.3d at 369 (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may establish identity. *Bell*, 512 S.W.3d at 198-200 (concluding circumstantial evidence that the defendant was the perpetrator was sufficient to uphold the verdict).

The Defendant in particular notes that the victim at one point testified, "If I was to see him out on the street today, I wouldn't even know who he was." The Defendant argues that the entire case hinged on the victim's eyewitness identification and that her testimony amounted to an acknowledgment that she was incapable of positively identifying the Defendant.

However, the State presented evidence apart from the victim's identification, and we conclude that the totality of the proof, while certainly not overwhelming, was sufficient to support the verdict. At trial, the victim testified that three masked, armed men entered her home and robbed her at gunpoint. She described one of the men to responding officers as heavyset, over six feet tall, weighing over two hundred and fifty pounds, and wearing all gray, including a gray hooded sweatshirt. Minutes after the crime, Officer Wakefield saw a man matching the description of the assailant in gray at a nearby home on Bronte Avenue. The man behaved suspiciously by changing his course halfway down the driveway of the home, returning to the porch, and pretending to unlock the front door prior to fleeing the marked police vehicle. A police dog tracked this man from where Officer Wakefield lost sight of him to where the Defendant was apprehended. When the dog turned into the driveway of the home on Litton Avenue where the Defendant was apprehended, the Defendant came out from behind a shed and said, "I give up." The Defendant's front side was wet. The Defendant, in his testimony, denied ever having been on Bronte Avenue, but Officer Wakefield testified that the Defendant was the person he saw running from the home on Bronte Avenue. A trash can eight feet from the arrest site yielded a gun which was placed on top of a black trash bag. The Defendant's height, weight, clothing, race, and haircut matched the victim's description. The victim testified that she was permitted to view the Defendant shortly after the crime and identified him as one of the assailants. However, she was clear that she could only identify him by his build, his clothing, and his hair and that she could not identify him by his facial features. The victim's statement that she would not know the Defendant on the street was made in the context of explaining that, prior to the crime, she was not acquainted with the Defendant. She stated, "I didn't really – no, I mean, I didn't know him. I've never had a conversation with him. I never remember seeing him. If I was to see him out on the street today, I wouldn't even know who he was." The victim confirmed that she identified the Defendant only because his physique, clothing, and hair were consistent with the assailant's.

The Defendant also made incriminating statements during telephone calls with his wife. After the preliminary hearing, he laughed about the victim's testimony that all of the guns were black, saying "It was so crazy, our guns wasn't even all black." He acknowledged in the call, "One of my guns is black," but at trial he testified, "I don't carry guns." During a telephone call with his wife on the day after his arrest, the Defendant told his wife that "they" should have waited, observing, "By the time I came across the fence, y'all was already gone all the way up the street already." Evidence established that a fence separated the apartment complex where the crime occurred from Bronte Avenue and that this fence was scalable and an occasional route for fleeing juveniles. The Defendant acknowledged that during another call the day after his arrest, his wife told him she "got Elijah and everything. I got both of them." The jury could have inferred she was referring to the two other suspects. The Defendant told his wife that if she had just done what he had asked, he could have jumped back in. While he testified this statement was in reference to a visit to his children, the Defendant did not tell law enforcement anything about leaving his home on South 8th to visit his children on Porter Road on the night of the offenses. Instead, he told police that he lived on Porter Road with his wife and that he got out of the car during an argument with his wife because he did not want the argument to go further. The Defendant held telephone conversations from which it could have been inferred that he had borrowed another man's gun and that the man was looking for the gun. The Defendant denied going by the nickname "J. Main," although he introduced himself as "Main" in one of the recorded telephone calls.

While the Defendant presented an alternate sequence of events in which he walked from Porter Road in search of two acquaintances after being abandoned by his wife at his children's mother's home, the jury could have discredited this version of events after hearing the Defendant and his wife refer in the telephone calls to companions despite their claim that no one had been with them, after hearing the Defendant refer to his wife and others driving off as he was coming across the fence, and after hearing the Defendant state, "[O]ur guns wasn't even all black." We cannot say that no rational juror could have found that the evidence established the Defendant's identity beyond a reasonable doubt.

## II. Show-Up Identification

The Defendant challenges the trial court's denial of the motion to suppress the victim's identification during a pretrial show-up. The State responds that the trial court correctly concluded that the show-up in this case was proper. We conclude that because the show-up constituted an on-the-scene investigatory procedure, it was not unnecessarily suggestive.

- 18 -

A trial court's findings of fact in a suppression hearing are binding on the appellate court unless the evidence preponderates against them. *State v. Clark*, 452 S.W.3d 268, 282 (Tenn. 2014). Questions regarding the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party who prevails at the trial level is entitled to the strongest legitimate view of the evidence and to reasonable and legitimate inferences which may be drawn from it. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Mixed questions of law and fact are reviewed de novo with no presumption of correctness. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008).

When law enforcement have procured suggestive circumstances leading a witness to identify a suspect, the principles of due process limit the admissibility of such evidence. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). A show-up, "when 'a single person is presented as a suspect to a viewing eyewitness,'" is inherently suggestive and "unfair to the accused." *State v. Thomas*, 780 S.W.2d 379, 381 & 381 n.1 (Tenn. Crim. App. 1989) (quoting *United States v. Sanders*, 547 F.2d 1037, 1040 (8th Cir.1976)). Such a procedure is in general "'highly suspect.'" *State v. Moore*, 596 S.W.2d 841, 843 (Tenn. Crim. App. 1980) (quoting *Marsh v. State*, 561 S.W.2d 767 (Tenn. Crim. App. 1977)).

Although a show-up is, by its very nature, suggestive, due process is not implicated unless the identification procedure used by law enforcement is "both suggestive and unnecessary." *Perry*, 565 U.S. at 238-39 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977)); *see State v. Martin*, 505 S.W.3d 492, 500 (Tenn. 2016). As the Supreme Court has explained, its decisions excluding evidence pertaining to unreliable identifications "turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array." *Perry*, 565 U.S. at 233. Absent improper actions by law enforcement, the reliability of the proof may be tested "through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.*

While a show-up identification is inherently suggestive, there are circumstances under which a show-up procedure may nevertheless be necessary. In Tennessee, courts have concluded that a show-up may be necessary when: "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." *Thomas*, 780 S.W.2d at 381 (footnotes omitted). Accordingly, "on-the-scene investigatory confrontations

within a reasonable time after the commission of an offense are permissible," as "'such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy.'" *Moore*, 596 S.W.2d at 844 (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C. Cir. 1968)). In particular, a witness may exonerate an innocent suspect and thereby permit law enforcement to conduct a timely search for the culprit. *Moore*, 596 S.W.2d at 844; *see Simmons v. United States*, 390 U.S. 377, 384-85 (1968) (holding that suggestive photographic identification was necessary because law enforcement officers were investigating a serious felony and needed "swiftly to determine whether they were on the right track, so that they could properly deploy their forces"). The validity of a show-up as an on-the-scene investigatory tool hinges on the continuity of time and place between the offense and the identification. *Moore*, 596 S.W.2d at 844; *see State v. Beal*, 614 S.W.2d 77, 81-82 (Tenn. Crim. App. 1981) (concluding that a show-up conducted at the scene of the crime ten days after the robbery was unnecessarily suggestive).

If an identification procedure is found to be both suggestive and unnecessary, suppression is required when the improper identification procedure created a "substantial likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). In making this determination, the court must assess the reliability of the identification, which is the "linchpin" of the admissibility analysis. *Mason v. Brathwaite*, 432 U.S. 98, 114 (1977); *see State v. Bonds*, 502 S.W.3d 118, 138-39 (Tenn. Crim. App. 2016). The court must evaluate whether the identification was reliable under the totality of the circumstances. *Biggers*, 409 U.S. at 199. Factors include the "opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation, and the length of time between the crime and the confrontation." *Beal*, 614 S.W.2d at 82 (citing *Brathwaite*, 432 U.S. at 114; *Biggers*, 409 U.S. at 199; *Rippy v. State*, 550 S.W.2d 636, 639-40 (Tenn. 1977)).

We conclude that the show-up, while clearly suggestive, was not unnecessarily so because it was part of an ongoing and uninterrupted investigation conducted close in time and location to the crimes. The police responded quickly to the report of a robbery and observed an individual who matched the description of one of the robbers on a street adjacent to the victim's home. This man changed his course when he observed the marked vehicle, stood on the porch of a house as though opening the door, and then ran from the porch when the vehicle turned around. He was apprehended within yards of the apartment complex, and a gun was discovered in a trash can eight feet from the arrest location. The Defendant was first seen approximately five minutes after law enforcement were dispatched to the scene, and he was arrested approximately fifteen to thirty minutes later, after a K-9 officer tracked him from the location where Officer Wakefield lost sight of him. The victim identified the Defendant by his clothing, hair, and atypical physique

approximately forty minutes after the initial emergency call was placed. The show-up, which was conducted close in time and location to the crime, was used as an on-the-scene investigatory tool by law enforcement and was necessary to determine the continued course of their investigation. Because the show-up was not both suggestive and unnecessary, the trial court did not err in determining that the evidence could be admitted without offending due process. *See State v. Tomario Walton a.k.a. Quadricus Dean*, No. W2011-01082-CCA-R3-CD, 2012 WL 3193366, at *6-8 (Tenn. Crim. App. Aug. 6, 2012) (the suspect being presented to the victim getting out of a police vehicle after being apprehended less than an hour after the report and within three miles did not render the show-up unnecessarily suggestive, but law enforcement's statement to the victim that the defendant had been found with her property did render it unnecessarily suggestive); *State v. Cory Shane Rollins*, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *5-6 (Tenn. Crim. App. Feb. 1, 2010) (show-up qualified as an on-the-scene investigatory procedure when the defendant was seen "pretty close" to the crime scene within twenty to thirty minutes of the crime and the victim identified him within an hour)[3]; *State v. Vidal L. Strickland*, No. M2002-01714-CCA-R3-CD, 2003 WL 22243440, at *12-13 (Tenn. Crim. App. Sept. 30, 2003) (the show-up was part of an on-the-scene investigatory procedure when the handcuffed suspects were presented next to a police vehicle with headlights shining on them within an hour of the crime while law enforcement were still on the scene and in the process of responding to the offense). At trial, the Defendant was able to demonstrate through cross-examination that the victim's identification was based on the fact that the Defendant's hair, clothing, and large physique matched that of the suspect. The jury was aware that the victim never saw the Defendant's face and could not identify him by his features. We conclude that the trial court did not err in denying the motion.

### III. Failure to Disclose Photographic Line-Up

---

[3] We note *Cory Shane Rollins* incorrectly states that Tennessee courts have adopted a strict rule barring evidence of unnecessarily suggestive confrontations. 2010 WL 342653, at *5 (observing that "[w]hile the federal courts declined to adopt a 'strict rule barring evidence of unnecessarily suggestive confrontations,' Tennessee courts have adopted such a rule" (quoting *Biggers*, 409 U.S. at 199)). Tennessee courts have in fact proceeded to analyze the totality of the circumstances under *Biggers* when an identification procedure has appeared unnecessarily suggestive. *See Bonds*, 502 S.W.3d at 139 ("The *Biggers* test for reliability is only triggered if the identification procedures were conducted in an impermissibly suggestive manner."); *Tomario Walton a.k.a. Quadricus Dean*, 2012 WL 3193366, at *8 ("Having found the showup unnecessarily suggestive, we must consider whether the totality of the circumstances under the *Biggers* factors indicates that the identification was reliable despite the unnecessary suggestiveness of the showup."); *Beal*, 614 S.W.2d at 82 ("However, under Tennessee law, as under federal law, the existence of an unnecessarily suggestive identification procedure will not trigger the application of a per se rule of exclusion.").

The Defendant asserts that the State's failure to produce evidence related to the photographic line-up prior to trial was a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and Tennessee Rule of Criminal Procedure 16. He asserts that the trial court erred in denying a continuance or mistrial based on the violations. The State responds that the Defendant failed to raise the mistrial issue in his motion for a new trial and that it is accordingly waived. The State also argues that the evidence was not material under the *Brady* standard and that the trial court's remedy of allowing the Defendant to recall witnesses was adequate.

Initially, we agree with the State that the Defendant waived the mistrial issue by failing to include it in his motion for a new trial. *See* Tenn. R. App. P. 3(e). The Defendant does not ask for plain error relief. On the other hand, the Defendant properly preserved the challenge to the trial court's denial of his motion for a continuance. The Defendant sought relief under both *Brady* and Tennessee Rule of Criminal Procedure 16. We conclude that because the material was disclosed in time for its effective use at trial, there was no violation of *Brady* and that the trial court did not abuse its discretion in fashioning a Rule 16 remedy.

## A. *Brady*

The suppression of evidence favorable to the accused is a due process violation when the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the evidence or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the evidence that was suppressed was favorable to the accused; and (4) the evidence meets the standard of materiality. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995).

The rule in *Brady* applies "not only to evidence in the prosecution's possession, but also to 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Jackson*, 444 S.W.3d at 594 (quoting *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999)). This includes "evidence in police possession which is not turned over to the prosecution." *Id.* Accordingly, the evidence here was in the possession of the State because law enforcement had the evidence even though the prosecutor did not know about it.

The State's *Brady* obligations reach all "favorable information," regardless of its admissibility. *Jordan v. State*, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011). "Information that is favorable to the accused may consist of evidence that 'could

- 22 -

exonerate the accused, corroborate[] the accused's position in asserting his innocence, or [contain] favorable information that would have enabled defense counsel to conduct further and possibly fruitful investigation regarding'" a potential defense. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001) (quoting *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992)). Evidence which permits the defense to impugn the reliability of the State's investigation, impeach the credibility of witnesses, or bolster the defense's position amounts to favorable evidence. *Jordan*, 343 S.W.3d at 96. Here, the parties agree that the evidence was impeachment for the victim's testimony that she did not view any photographic line-ups or have contact with detectives after her initial report.

Nevertheless, there is no suppression when the material is disclosed in time for a defendant to use it effectively at trial. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (finding no *Brady* violation where the material was disclosed at trial and the defendant refused an opportunity to postpone the trial); Wayne R. LaFave et al., 6 Crim. Proc. § 24.3(b) n.88 (4th ed. 2017). "Although the complete non-disclosure of significant exculpatory evidence often makes an easy case for a due process violation, delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting). Because a violation occurs only when the suppression of material exculpatory evidence prevents its effective use at trial, "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *Davis*, 306 F.3d at 421). Delayed disclosure constitutes a due process violation only when the delay causes prejudice to the defendant. *Id.*

Here, the material disclosed during trial was relevant to impeach the victim's testimony about her contacts with law enforcement. The trial court allowed the Defendant to recall the victim and to impeach her with the evidence. In ruling on the motion for a continuance, the trial court asked the Defendant to articulate the prejudice from the late production, and the Defendant only stated that he had not had the opportunity to cross-examine the victim and that he would like the opportunity to explore the circumstances of the line-up with the detective. The trial court permitted the Defendant to question Detective Rummage regarding the line-up and to cross-examine the victim about the line-up and about her previous testimony denying that she had never been shown a line-up.

The Defendant also argues that the evidence was relevant to his theory of the case that the juvenile in the line-up was the actual perpetrator. However, the proof at trial shows that the Defendant was well aware of the juvenile's identity, having secured Ms. London, Detective Brown, and Mr. Mitchell as witnesses to testify that the victim had

suspected the juvenile of involvement. The record is also clear that the juvenile, who was five feet, six or seven inches tall and weighed one hundred and forty-five pounds, did not resemble the Defendant, who was six feet, one inch tall and weighed two hundred and sixty pounds. Accordingly, there was no allegation that the victim mistook the Defendant for the juvenile; instead, the proof suggested the juvenile may have been one of the other two men. The Defendant was aware that the victim had seen the juvenile and had made some allegation that he was involved in the crime but that she subsequently declined to pursue the allegations. While the Defendant speculates that he "could have developed another theory of the case" if he had known that the victim failed to identify the juvenile in a line-up, he makes no particularized allegation regarding how the late disclosure affected his strategy. We conclude that, because the Defendant was aware of the juvenile's identity and was able to explore the implications of the line-up by recalling witnesses for cross-examination, the material was disclosed in time for its effective use at trial.

## B. Tennessee Rule of Criminal Procedure 16

The Defendant also asserts the failure to produce the material was a violation of Tennessee Rule of Criminal Procedure 16, which states,

> (F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:

> (i) the item is material to preparing the defense;

> (ii) the government intends to use the item in its case-in-chief at trial; or

> (iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F). In the event of a violation, the Rule provides that the trial court may order discovery or inspection, grant a continuance, exclude the evidence, or take other remedial measures. Tenn. R. Crim. P. 16(d)(2). Accordingly, the trial court should fashion relief which is effective and appropriate. *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000). Any prejudice accruing to the accused is a factor in determining what remedy is appropriate. *State v. Giles*, 493 S.W.3d 504, 521 (Tenn. Crim. App. 2016). "A trial court has wide discretion in fashioning a remedy for non-compliance with a discovery order, and the sanction should fit the circumstances of the

case." *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). An abuse of discretion occurs when the trial court applies an incorrect legal standard or when it reaches a decision which is against logic or reasoning and which causes an injustice to the party complaining. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013).

When the prosecution has failed to disclose discoverable evidence, the burden of proving "the degree to which the impediments to discovery hindered trial preparation and defense at trial" falls on the defendant. *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992). When questioned by the trial court at trial, the Defendant stated that he requested a continuance or mistrial because he had not been able to cross-examine witnesses or question the detective regarding the circumstances of the line-up. The Defendant was generally aware that the victim had made allegations that the juvenile was one of the other two men involved in the crime, and he had subpoenaed several witnesses to introduce proof regarding these allegations. We conclude the trial court did not abuse its discretion in fashioning a remedy by permitting the Defendant to recall witnesses to cross-examine them in light of the new evidence and to present the testimony of the detective. *State v. Michael Wayne Davis*, No. M2010-02108-CCA-R3-CD, 2013 WL 105172, at *10 (Tenn. Crim. App. Jan. 9, 2013) (affirming the trial court's denial of sanctions for a discovery violation when the defendant was not able to articulate what prejudice he suffered or how his trial strategy would have changed if the disclosure of his prior statement had been timely). Accordingly, the Defendant is not entitled to relief on this ground.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE